**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**'06 CIV 15358**

------------------------------------------------------------------x

SAMUEL SHECHTER, SUMMIT AT POMONA LTD.,
and SHELDON OCKO,
Individually and on Behalf of all Others
Similarly Situated,

Docket No.:

                        Plaintiffs,

**CLASS ACTION**
**COMPLAINT**

vs.

JOSEPH TUREK, KATRINA CHAMPAGNE,
BIOMETRICS 2000 CORPORATION, AKCESS
BIOMETRICS CORPORATION, AXIOM SOLUTIONS
CORPORATION, PERRIN HOLDEN &
DAVENPORT CAPITAL CORP., AARON CAPITAL, INC.,
NELSON BRAFF, AND EYTAN SUGARMAN,

**PLAINTIFFS DEMAND**
**TRIAL BY JURY**

                       Defendants.

**BRIEANT**

------------------------------------------------------------------x

Plaintiffs, Samuel Shechter, Summit at Pomona Ltd., and Sheldon Ocko, by their

attorneys Depodwin & Murphy, Esqs. and Meiselman, Denlea, Packman, Carton & Eberz

P.C., Individually and on Behalf of all Others Similarly Situated, as and for their Class

Action Complaint against defendants, allege with personal knowledge as to their own

actions and upon information and belief as to the actions of others, as follows:

## THE PARTIES

1.     Plaintiff, Samuel Shechter ("Shechter"), is a natural person of full age of

majority domiciled and residing in the State of New York.

2.     Plaintiff, Summit at Pomona Ltd. ("Summit"), is a business corporation

organized under the laws of the State of New York with its principal place of business in

the State of New York.

3.     Plaintiff, Sheldon Ocko ("Ocko"), is a natural person of full age of majority

1

domiciled and residing in the State of New York.

4.      Defendant, Joseph Turek ("Turek"), is a natural person of full age of majority who, upon information and belief, claims to be domiciled and residing in the Commonwealth of Massachusetts. Turek is also known as Joe Turek, Joseph Turek, Jr., and/or Joe Turek, Jr.

5.      Defendant, Katrina Champagne ("Champagne"), is a natural person of full age of majority who, upon information and belief, claims to be domiciled and residing in the Commonwealth of Massachusetts.

6.      Defendant, Biometrics 2000 Corporation ("Biometrics"), is a business corporation organized and existing under the laws of the State of New York that at all times material and relevant to plaintiffs' Class Action Complaint maintained its principal place of business in the Commonwealth of Massachusetts, and which transacted business in the State of New York.

7.      Defendant, Akcess Biometrics Corporation ("Akcess"), is a business corporation organized under the laws of the State of Nevada with its principal place of business in the Commonwealth of Massachusetts, which at all times material and relevant to plaintiffs' Class Action Complaint transacted business in the State of New York.

8.      Defendant, Axiom Solutions Corporation ("Axiom"), is a business corporation organized under the laws of the State of Nevada with its principal place of business in the Commonwealth of Massachusetts, which at all times material and relevant to plaintiffs' Class Action Complaint transacted business in the State of New York.

9.      Defendant, Perrin, Holden & Davenport Capital Corp. ("PHD"), is a business corporation organized and existing under the laws of the State of New York with its

2

principal place of business in the State of New York, which at all times material and relevant to plaintiffs' Class Action Complaint transacted business in the State of New York.

10.     Defendant, Aaron Capital, Inc. ("Aaron"), is a business corporation organized under the laws of the State of Texas, which at all times material and relevant to plaintiffs' Class Action Complaint transacted business in the State of New York.

11.     Defendant, Nelson Braff ("Braff"), is a natural person of full age of majority who, upon information and belief, is domiciled in and residing in the State of New York.

12.     Defendant, Eytan Sugarman ("Sugarman"), is a natural person of full age of majority who, upon information and belief, is domiciled in and residing in the State of New York.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 15 U.S.C. §78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, and pendent laws of the State of New York.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

15.     This Court has personal jurisdiction over the defendants because their involvement, as described below, in the sales of securities and fraudulent acts was substantially performed within this judicial district.  The defendants have transacted business and/or do transact business within this judicial district, and/or are incorporated in the State of New York.  Furthermore, the defendants' conduct constitutes the

3

commission of tortious acts within this judicial district, which caused plaintiffs' damages within this judicial district.

16.    Venue is proper in this District pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1391(b), as many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this judicial district.  In addition, at least one defendant maintains its principal place of business within this District, and at least one defendant is incorporated under the laws of the State of New York that encompasses this District. Furthermore, upon information and belief, there is no district in which all defendants reside, such that this judicial district is otherwise the proper venue for this action pursuant to 28 U.S.C. §1391(a)(2).

17.    In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, interstate "wires" such as the mails, interstate telephone communications, interstate internet and email communications, and the facilities of the national publicly traded securities markets.

## CLASS ACTION ALLEGATIONS

18.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased, acquired and/or held the securities of Biometrics,  Akcess and/or Axiom between January 1, 2003 and the present, inclusive (the "Class Period"), and/or who were fraudulently induced to "invest" in, acquire shares of, and/or loan money to Biometrics and/or Akcess and/or Axiom (and/or their principals), and who were damaged thereby. Excluded from the

Class are defendants, the officers, directors and agents of the defendants, at all relevant times, members of the defendants' immediate families and their legal representatives, heirs, successors, assigns and/or agents, and any commercial entity in which defendants have or had a controlling interest, and/or any of the same who received any income, profit or benefit as a result of the wrongful conduct alleged herein.

19.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Biometrics common shares and/or other securities were actively traded on the public securities exchanges, including the NASDAQ. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are several hundred members in the proposed Class.  Biometrics share owners of record and other members of the Class may be identified from records maintained by Biometrics, Akcess and/or Axiom, or their transfer agents, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected and damaged by defendants' wrongful conduct in violation of federal law and New York State law that is complained of herein.

21.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

22.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over any questions which may affect individual Class members.  Such

commonalities include:

    a.    Whether the Securities and Exchange Act of 1934 was violated by
          defendants;

    b.    Whether defendants omitted and/or misrepresented material facts;

    c.    The nature of the fraudulent misrepresentations defendants have
          made;

    d.    Whether defendants' statements omitted material facts necessary to
          make the statements made, in light of the circumstances under which
          they were made, not misleading;

    e.    Whether defendants knew or deliberately disregarded the facts that
          their statements were false and misleading;

    f.    Whether the price of Biometrics, Akcess, and/or Axiom common stock
          was artificially inflated or impacted as a result of defendants' conduct,
          misrepresentations and/or omissions;

    g.    Whether defendants, or their agents or employees, engaged in
          unlawful insider trading in the shares of Biometrics;

    h.    The extent of damage sustained by the Class members and the
          appropriate measure of damages; and

    I.    Whether defendants' conduct warrants a determination that the Court
          should "pierce the corporate veil" and/or as such hold defendants
          jointly and severally (and individually and personally) liable to plaintiffs
          for all damages which is awarded to the plaintiffs and the Class.

    23.    A class action is superior to all other available methods for the fair and

efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may, in some

instances, be relatively small, the expense and burden of individual litigation would make

it impossible for members of the Class to individually seek redress for the wrongs done to

them by defendants.  There will be no difficulty in the management of this action as a class

6

action.

## BACKGROUND

### The Parties

24.     Biometrics is a corporation organized under the laws of the State of New York, which claims its principal place of business to be in (and transacting business in) the State of Massachusetts.  At all material times, the President and Chief Executive Officer of Biometrics was Turek, and Champagne served as a corporate officer and/or director of Biometrics. At all material times, Biometrics transacted business in the State of New York.

25.     Biometrics was originally incorporated in 1992 under the name Big City Bagels, Inc.  A certificate of amendment was filed with the Secretary of the State of New York in 1999 changing Biometrics' name to Villageworld.com, Inc.  Another certificate of amendment was filed in 2004 changing the corporation's name to its current name Biometrics 2000 Corporation.

26.     Biometrics is purportedly in the business of developing and marketing biometric security devices.

27.     Akcess is a corporation organized at the specific instance and request of Turek under the laws of the State of Nevada, which claims its principal place of business to be in the Commonwealth of Massachusetts.   At all material times, its President, Treasurer, Secretary and Director was Champagne.  Akcess operates under the dominion and control of Turek.

28.     Axiom is a corporation organized at the specific instance and request of Turek under the laws of the State of Nevada, which claims its principal place of business

7

to be in the Commonwealth of Massachusetts.  At all material times, its President, Treasurer, Secretary and Director was Champagne. Akcess operates under the dominion and control of Turek.

29.    Akcess was incorporated in early December 2005 at the specific instance and request of Turek.

30.    Axiom was incorporated in early December 2005 at the specific instance and request of Turek.

31.    Akcess is also purportedly in the business of developing and marketing biometric security devices.

32.    Axiom is also purportedly in the business of developing and marketing biometric security devices.

33.    Although Akcess' and Axiom's sole officer and director is claimed to be Champagne, upon information and belief, Turek has operated and is operating Akcess and/or Axiom as extensions of Biometrics, the latter corporation which filed for bankruptcy protection in the United States Bankruptcy Court for the Western District of Pennsylvania on October 15, 2005.

34.    Shechter is and has been for substantially all material times the sole shareholder, director, and officer of Summit.

35.    Shechter, individually and through Summit, and Ocko have both invested in and/or loaned money to Turek, Biometrics, Akcess, Axiom and/or "Turek & Co.".  Their investments have been in the form of purchases of stock and/or loans to the company, such that Shechter and Ocko are both equity shareholders and creditors of Biometrics. Although Shechter and Ocko were promised that they would be provided with shares of

8

stock in Akcess and/or Axiom for certain of the investments they made, they were not in fact provided with any shares of stock for certain or all of those advances of money and investments which were made to Biometrics, and which were converted by Turek and/or Champagne. In addition, Shechter, Summit, and Ocko have loaned money to Turek, Biometrics, Akcess, and/or Axiom, which upon information and belief, Turek, Biometrics, Akcess and/or Axiom never had any intent to repay.

**The Frauds**

36.    During or about 2003, Turek approached Shechter, in person and over interstate wires, requesting Shechter's investment in Biometrics. At Turek's request, Shechter "introduced" numerous people (many of whom comprise the Class) to Turek and Biometrics, including Ocko, who later invested in Biometrics and/or Akcess and/or Axiom, or who loaned money to Biometrics, Akcess , Axiom, and/or Turek individually.

37.    Turek, acting in concert with Champagne, induced Shechter, Ocko, and the other members of the class, to invest in Biometrics and/or Akcess and/or axiom by making numerous false and fraudulent misrepresentations, upon which plaintiffs reasonably relied, from, in or about the Commonwealth of Massachusetts and in the County of Westchester in the State of New York, including but not limited to the following as are set forth herein with particularity. In addition to the particular misrepresentations set forth below, Turek and his agents, including Champagne, have repeatedly made the same or similar misrepresentations on numerous occasions to plaintiffs and members of the Class, in person, through the United States mails, and/or through interstate wires including interstate telephone and interstate internet devices, at numerous locations and on numerous dates and times.

38.    At a meeting held at a warehouse in Springfield, Massachusetts in the Spring of 2005, Turek made the following false statements, misrepresentations and false representations:

      a.    He was a graduate of the Massachusetts Institute of Technology;

      b.    Biometrics was involved in an active business relationship with Honeywell;

      c.    Turek and Biometrics had a viable commercial relationship with various departments of the United States government, including but not limited to national security, intelligence, counter-intelligence, and or law enforcement agencies;

      d.    Biometrics was doing business with a firm involved in the medical insurance business that was managed by the brother of a former United States Secretary of State the Hon. Henry Kissinger;

      e.    Numerous applications for the patent of devices that were purportedly invented or developed by Turek to be exclusively licensed to and/or used, developed and marketed by Biometrics, Akcess and/or Axiom, with the use of the plaintiffs' funds, had been granted, received preliminary approval and/or were pending before the United States Patent and Trademark Office;

      f.    Biometrics had the technology for and had developed a device that could take high-resolution photographs of an individual's hand from a distance of approximately twenty feet that could provide readable fingerprint images; and

      g.    That Biometrics was about to "go public" and that anyone who owned shares of the company would profit handsomely by the acquisition of Biometrics.

39.    On numerous occasions in 2003, 2004, 2005 and 2006, Turek and/or champagne conversed with Shechter and Ocko over the telephone and made representations/promises to them in group settings and individually. These telephone conversations generally occurred on a weekly basis, with many of the calls taking place several times during each week. The calls were generally placed or received, as the case

may be, by Turek at the office locations of Biometrics, Akcess, Axiom, and/or via cellular telephone. Turek often spoke to Shechter and/or Ocko from his cellular telephone. The calls were most often placed between Massachusetts and New York. During the telephone calls, Turek made material false promises and statements, mis-representations and false representations, including but not limited to the following:

    a.    Biometrics' security devices were being implemented and used by or in various national security intelligence and/or secured military facilities;

    b.    Biometrics was about to begin securing orders for the delivery of its security devices to the United States Department of Homeland Security;

    c.    Biometrics' products had been incorporated into various commercial facilities and institutions around the country;

    d.    He worked non-stop and lived frugally;

    e.    He and other principals of Biometrics held numerous patents or patent applications (at least six (6) in total) for the technologies and devices which would or were exclusively licensed to and related to the products Biometrics purportedly marketed and sold;

    f.    The value of the patents that he and other principals held or were applying for to benefit Biometrics (and thus its shareholders) had a value of "a billion dollars;

    g.    Within a few years, Biometrics' sales would be so large that Honeywell or General Electric would "buy the company out";

    h.    That Biometrics had potential sales to Disney and the United States border control agencies that were "in the millions;"

    I.    Biometrics' business conditions were always "great" and its sales were between at least $30,000 and $50,000 each month;

    k.    Each sale made by Biometrics generated a 50% net profit to the company; and

    l.    The current fair market value of the stock was actually more than the

price that it was selling for.

40.      At a meeting held at the Tarrytown, New York Hilton Hotel in mid-2005, Turek

brought with him a person who misrepresented to Shechter and Ocko that he and Turek

were preparing to sell to police forces in Japan a device that all police officers would carry

on their person that would be able to identify fingerprints of all Japanese citizens.

**The Public Filings**

41.      Although Biometrics is a publicly traded company, the defendants have

wrongfully failed to make any filings as required by Turek or the company with the

Securities and Exchange Commission ("SEC") since March 31, 2005.   The last filing that

Biometrics made was its SEC Notification of Late Filing for its SEC Form 10-KSB for the

period ending December 31, 2004.   This filing contains no substantive or material

information about the company and its business affairs.

42.      Upon information and belief, Turek and/or Champagne have never convened

any meetings of shareholders of Biometrics, Akcess or Axiom, and have never delivered

to the shareholders any annual reports.

43.      Immediately preceding the above filing with the SEC was Biometrics' SEC

Form 10-QSB for the period ending September 30, 2004. That filing was certified by Turek

as Biometrics' Chief Executive Officer and Chief Financial Officer. The filing states, among

other things, that as of September 30, 2004:

        a.      The company's total assets were $228,604; its total liabilities were
$3,070,424; and the total stockholders' "deficiency" was $2,841,820.
Significantly, the defendants had acted in a manner which caused the
company's total liabilities to increase to that amount from $864,030 as
of September 30, 2003; and its total stockholders' deficiency had
increased from $823,650 as of September 30, 2003; and

  b.  The company's pre-tax loss from continuing operations in the three months ending September 30, 2004 was $251,661, and the company's pretax loss from continuing operations in the nine months ending September 30, 2004 was $1,310,919. In the nine months ending September 30, 2004, Biometrics had a net loss of $1,310,919, as defendants reported to the SEC.

44. The public SEC filings made by Biometrics, its agents, and certified by Turek, as of September 30, 2004, asserted that the company was losing money. These figures directly contradict the repeated material false representations made by Turek to Shechter, Ocko and other members of the Class that (as to Biometrics' financial condition) "everything is great," "sales were between $30,000 and $50,000 every month," and that the future of the company is such that a major industrial corporation would "buy the company out" in a few years.

**The Sham Bankruptcy**

45. Despite Turek's statements to Shechter, Ocko and other members of the Class about a good financial condition for the company and its prosperous future, on October 15, 2005, Biometrics filed for Chapter 11 bankruptcy protection in the United States District Court for the Western District of Pennsylvania.

46. In its bankruptcy filings, Biometrics stated its total assets as $70,250, and its total liabilities as $2,762,221.

47. The bankruptcy petition was executed by Sugarman, purportedly on behalf of Biometrics, despite the fact that Sugarman was not an officer or director of the company and had no legal capacity to execute the petition on behalf of Biometrics.

48. Upon information and belief, Sugarman executed the bankruptcy petition purportedly on behalf of Biometrics at the request of PHD, or persons acting together with

PHD.

49.     The bankruptcy petition was filed in an improper venue. Biometrics had absolutely no contact with the Western District of Pennsylvania that could in any way serve as a basis for filing the petition there.

50.     Sugarman, Turek, PHD and other employees of PHD knew that venue was improper in the Western District of Pennsylvania, but decided to file the petition there in order to take advantage of what they perceived to be a favorable jurisdiction where the Court would not unduly scrutinize the bankruptcy filings or the plan of reorganization that PHD would propose.

51.     Turek repeatedly misrepresented to Shechter, Ocko and others from the Commonwealth of Massachusetts and the State of New York, with intent to deceive them and the members of the Class, that he did not know that the bankruptcy petition had been filed and that he had nothing to do with the filing of the bankruptcy petition. Despite the fact that he knew that the company was intending to file for bankruptcy protection, he never informed Shechter or Ocko, or the other members of the Class, even though he continued to solicit their investment(s) in the company and Akcess (as to Shechter).

52.     Between the date that Biometrics filed its bankruptcy petition on October 15, 2005 and the time that Shechter learned of the same through rumor in or about January 2006, Turek solicited and obtained an additional approximately $330,000 from Shechter. Turek made the solicitations knowing that Biometrics had filed its bankruptcy petition.

53.     Shechter would not have, under any circumstances, agreed to invest that sum had Turek informed him of the fact that the company had filed for bankruptcy protection.

14

54.    Defendants and their agents failed to give notice to or to list Shechter and Ocko, or any members of the Class, in any of Biometrics' bankruptcy filings as either equity shareholders or creditors of the company. The omission of the plaintiffs and others, as shareholders and/or creditors of the company, was an intentional and illegal act designed to conceal from them the status of Biometrics being in bankruptcy.

55.    Prior to the filing of Biometrics' bankruptcy petition and the formation of Akcess and Axiom, in or about August or September 2005, Turek, Champagne, and others, caused the printing, publication and dissemination of various documents in the name of Akcess, including one which sought to sell and market products purportedly made, sold and/or marketed by Biometrics, or products licensed in the name of and to Biometrics. This, in part, caused Shechter to rely upon the fraudulent representations as to the companies' business and sales.

56.    Subsequent to the filing of the bankruptcy petition, Turek and/or Champagne caused the incorporation of Akcess and Axiom. Turek and Champagne have stated to Shechter and Ocko that they needed a clean, new company to start over, and that their investments in Biometrics would translate to an investment in Akcess and/or Axiom by way of the issuance of "founders" shares of stock in Akcess and/or Axiom.

57.    Turek and Champagne intentionally misrepresented to Shechter, Ocko and others that if the "new" company Akcess and/or Axiom was able to secure their financing and investment, that it would have $20 million in sales in the first year. Shechter reasonably relied upon these misrepresentations and loaned additional money to Biometrics and/or Turek.

58.    To date, neither Shechter or Ocko have received any shares of Akcess or

Axiom, and have not received any of the "founders shares" of Akcess or Axiom that they were promised in exchange for their "investments."   Although Turek has represented to third parties that Akcess and/or Axiom in fact issued all of their "founders" shares, upon information and belief, defendants have willfully failed to do so.

**The Traders and Market Makers**

59.     PHD is a securities brokerage and investment banking firm.  It has at all material times acted as an agent for Biometrics, Akcess and/or Axiom.

60.     Some of the shares of Biometrics stock that Shechter purchased were purchased, at the specific direction of Turek, through PHD as broker and Shechter utilized PHD and subsequently Aaron as his broker.

61.     Upon information and belief, Turek has advised some of those persons who are members of the Class wishing to "invest" in Biometrics and Akcess do so through PHD and subsequently Aaron.

62.     Turek advised Shechter that he should purchase his shares of Biometrics through PHD, pursuant to which Shechter opened a brokerage account with PHD. Turek advised Shechter to speak with Braff regarding his investments in Biometrics.

63.     Braff represented to Shechter that Biometrics' stock was "going nowhere but up;" that Biometrics was a "great company;" and that purchasing Biometrics stock was a sound investment.

64.     At the time that Braff made the representations to Shechter, he knew or should have know through the exercise of any degree of reasonable diligence, that Biometrics was floundering as a business entity, was incurring debt, was incurring a severe stockholders deficiency, and was not complying with SEC regulations.

16

65.     In addition to serving as a broker that brokered Biometrics stock, PHD has also been involved with Biometrics as an investment banker.  PHD promoted and effected a "reverse merger" between Biometrics' predecessor (Villageword.com, Inc.) and Biometrics itself.  Prior to and after Biometrics filed for Chapter 11 bankruptcy protection in October 2005, PHD has promoted a purported re-organization plan that would result in another merger involving Biometrics, whereby Shechter and Ocko and the Class would not have received any, or would only have received de minimis, compensation for their investments.

66.     Upon information and belief, PHD, Braff, Turek, Champagne, and others who should be determined by this Court to be "insiders" continued to promote and/or trade in Biometrics stock even after the company filed for bankruptcy protection, knowing that the company was in bankruptcy and knowing that the equity shareholders would ultimately receive nothing on their investments.

67.     Upon information and belief, PHD helped to conceive and effect the Biometrics bankruptcy proceeding.

68.     Aaron is also a securities brokerage and investment banking firm with a principal place of business in the State of California.

69.     Turek advised Shechter that he should use Aaron in order to trade his shares of Biometrics.

70.     At the specific instance and request and in reliance upon the representation of Turek, Shechter was induced by Turek to open a securities trading account with Aaron, and convinced Shechter to give him the right to control the trading of Biometrics stock in the account.

17

71.     On numerous occasions in 2004 and 2005, Turek, without the knowledge, advice or consent of Shechter, directed Aaron to sell the Biometrics stock that was being held in Shechter's Aaron account.  The proceeds of the sales of this stock were wire-transferred, at the direction of Turek, to an account that was jointly titled in the name of Turek and Shechter.  Turek, without the knowledge, advice or consent of Shechter, then wrote checks from that account payable to Biometrics, and then cashed these checks or deposited these checks into accounts that he controlled.

**The Intent and the Reliance**

72.     Shechter, Ocko and many of the other "investors" in Biometrics and Akcess and/or Axiom are elderly persons, more easily susceptible to manipulation and deceit.

73.     Turek, Champagne, Biometrics, Akcess and/or Axiom, with the assistance of PHD and Aaron, made the numerous material misrepresentations alleged herein with the intent to deceive Shechter, Ocko and others into providing money to Biometrics and/or Akcess.  Turek and Champagne knew and had substantial reason to believe that their statements regarding Biometrics' and Akcess' and Axiom's volume of sales, the worth of the patents, the value of the other technology, the customers of the companies, the future of the companies, etc., were not true, but defendants made those statements anyway, with intent to deceive the plaintiffs, the Class members and "investors" and trick them into providing money to defendants by false pretenses.

74.     In addition, Turek and Champagne, with the assistance of PHD, have acted in a manner that has ruined whatever business opportunities Biometrics, Akcess and/or Axiom may have had.  By promoting bankruptcy of Biometrics, they have acted in a manner that paralyzed Biometrics and which has tainted the reputation and productivity of

18

Akcess and Axiom.

75.     Shechter and Ocko and the Class reasonably relied upon the material misrepresentations made by Turek, Champagne and the other defendants alleged herein.

76.     Some of Shechter's investments and/or loans to Biometrics, Turek and/or Akcess and/or Axiom were advanced through Summit, which advanced money to Biometrics, Akcess, Axiom and/or Turek in the form of loans which Turek and/or Biometrics never intended to repay.

### FIRST CAUSE OF ACTION CLAIM
### Violation Of Section 10(b)
### Of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

77.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

78.     During the Class Period, defendants, and each of them, carried out a plan and scheme to defraud and course of conduct which was intended to and, throughout the Class Period; did: (i) deceive the investing public, including plaintiffs and other class members, as alleged herein; (ii) artificially inflate and maintain the market price of Biometrics securities; (iii) enable defendants to trade/sell and/or broker the sale(s) of millions of shares of Biometrics stock; and (iv) cause plaintiffs and other members of the Class to purchase Biometrics securities at artificially inflated prices, when in fact the shares were worthless or caused to be worthless by defendants' conduct; (v) engage in "insider trading" which upon information and belief, included the defendants obtaining the proceeds of said wrongful trades; (vi) engage in "insider" "short sale(s);" and (vii) engage in acts which resulted in the stock price to deflate and the stock to become worthless.   In

19

furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions and/or consented to the wrongful conduct alleged herein.

79.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made false statements of material facts and/or omitted to state material facts necessary to make the statements not be misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Biometrics securities in an effort to induce them to loan money to defendants and purchase the securities and/or maintain artificially high market prices for Biometrics securities in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below,

80.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative material statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the Securities and Exchange Commission as embodied in  Regulation S-X (17 C.F.R.  Sections 210.01 el seq.) and Regulation S-K (17 C.F.R.   Sections 229.10 et seq.) and other regulations, including the defendants' obligations to communicate accurate and truthful information with respect to the companies' operations, financial condition and earnings so that the market price of the companies' securities would be based on truthful, complete and accurate information.

81.     Defendants, individually and acting in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce, interstate telephone, and internet

20

communications, and/or of the United States mails, engaged and participated in a continuous course of wrongful conduct to conceal adverse material information about the business, operations and future prospects of Biometrics and/or Akcess as specified herein.

82. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive and mislead investors of Biometrics, Akcess and/or Axiom's value, performance, growth potential, and continued substantial revenues, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Biometrics, Akcess and/or Axiom and their business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Biometrics, Akcess, and/or Axiom securities during the Class Period.

83. Turek and Champagne's primary liability, and controlling person liability to the plaintiffs and the Class, arises *inter alia* from the following facts: (i) they were high-level executives and/or directors of the companies (Biometrics and Akcess) during the Class Period: (ii) they were privy to and participated in the creation, development and reporting of the companies' plans, projections and/or reports; (iii) they were aware of the companies' dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading; and (iv) during that period, Turek and Champagne were directors and/or officers and/or had control of Biometrics.

84. The defendants had actual knowledge of the misrepresentations and

21

omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to and/or were actually known to them.   Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Biometrics' and Akcess' financial and operating condition(s) and future business prospects from the investing public and supporting the artificially inflated price of Biometrics' securities, when Biometrics securities were worthless.   As demonstrated by defendants' overstatements and misstatements of the companies' business, operations and earnings throughout the Class Period: defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless, negligent, and/or grossly negligent  in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether their statements were false or misleading.

85.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed same to be true.  If Plaintiffs and the other members of the Class and the marketplace had known of the true financial condition and business prospects of Biometrics and Akcess, which were willfully concealed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Biometrics securities, nor would Shechter and Ocko advanced money to the defendants as alleged herein.

86.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

87.    All defendants are jointly and severally liable to plaintiffs and members of the

class because they acted in concert with one another, intentionally and with reckless disregard for the rights of plaintiffs and the members of the Class,

88.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the companies' securities during the Class Period, in an amount to be determined by the Court.

**SECOND CLAIM**
**Violation Of Section 20(a) Of**
**The Exchange Act Against The Individual Defendants**

89.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

90.     Turek and Champagne acted as controlling persons of Biometrics, Akcess and/or Axiom within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of defendants high-level positions, inside "information" and their ownership and contractual rights, participation in and/or awareness of the companies' operations and/or intimate knowledge of the information disseminated to the investing public, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the companies, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  Turek, Champagne, PHD and Aaron were provided with or had unlimited access to information alleged by plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     In particular, Turek and Champagne had direct and supervisory involvement in the day-to-day operations of the companies and, therefore, are presumed to have had

23

the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

92.     As set forth above, Biometrics, Turek, Champagne, PHD and Aaron each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position each as a controlling person, Turek and Champagne are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Biometrics's and Turek's and Champagne's wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the companies' securities during the Class Period, in an amount to be determined by the Court.

### THIRD CLAIM
### Fraud Claim Against All Defendants

93.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

94.     The conduct of defendants described herein constitutes fraud and/or constructive fraud by defendants against the plaintiffs and the members of the Class.

95.     As a direct and proximate result of the aforesaid acts of fraud and/or constructive fraud by defendants, plaintiffs have been damaged in amounts to be determined by this Court.

96.     The conduct of defendants was committed in wanton, reckless and wilful disregard to the rights of the plaintiffs and the members of the class, thereby warranting an award of punitive damages in favor of the plaintiffs and against defendants.

## FOURTH CLAIM
## Conversion

97.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

98.    The conduct of defendants described herein constitutes conversion and the intentional and wrongful taking of control of plaintiffs' and the other members' of the Class property and money.

99.    As a direct and proximate result of the aforesaid acts of conversion, plaintiffs have been damaged in amount to be determined by this Court.

100.    Defendants are jointly and severally liable for their acts of conversion for damages in an amount to be determined by the Court.

## FIFTH CLAIM
## Unjust Enrichment

101.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

102.    The acts of defendants have resulted in an impoverishment of plaintiffs and the other members of the Class, and an enrichment of defendants, who have tricked and deceived plaintiffs and the Class members into "investing" their money.

103.    Defendants have been unjustly enriched by their conduct and deceit.

104.    Plaintiffs may be without adequate remedy in damages.

105.    As a direct and proximate result of the aforesaid acts of unjust enrichment, plaintiffs have been damaged in amount to be determined by this Court.

106.    Defendants are jointly and severally liable for their acts of unjust enrichment.

## SIXTH CLAIM
## Constructive Trust

107.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

108.   Defendants' conduct towards plaintiffs and the other members of the Class was done pursuant to a relationship of trust and confidence.

109.   Defendants acted towards plaintiffs by knowingly falsely making certain promises and representations.  Plaintiffs reasonably relied upon those false promises and representations.

110.   As a result of the foregoing, plaintiffs are entitled to writs of attachment and the imposition of a constructive trust on all of the money, property, and assets of defendants needed to compensate them for the damages and losses they have sustained.

## SEVENTH CLAIM
## Money Had and Received

111.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

112.   The receipt of the assets or funds by defendants all constitute money had and received by them, which is the direct and proximate cause of damages to plaintiffs and the members of the Class.

113.   As a result of the money had and received by defendants, plaintiffs have been damaged in amounts to be determined by this Court, and are entitled to have a monetary judgment and, where appropriate, equitable relief entered against defendants.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

a.      Determining that this action is a proper class action, designating plaintiffs as co-lead plaintiffs and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs counsel as Lead Counsel;

b.      Awarding compensatory damages and punitive damages in favor of plaintiffs and the other class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding plaintiffs and the Class attachment against and the imposition of a constructive trust upon the property, assets and monies of the defendants;

d.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees, litigation expenses, and expert fees; and

e.      Such other and further relief as the Court may deem just, proper and equitable under the circumstances.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:      White Plains, New York
            December 21, 2006

Respectfully submitted,

_Peter N Freiberg_

**RICHARD C. BAKER, ESQ - RB 0143**
**PETER N. FREIBERG, ESQ - PF 1561**
Meiselman, Denlea, Packman, Carton & Eberz P.C.
1311 Mamaroneck Avenue
White Plains, New York 10605
Telephone: (914) 517-5000

and

**ANDREW H. DE PODWIN, ESQ - AD 3768**
De PODWIN & MURPHY, ESQS.
500 Airport Executive Park - Suite 502
Nanuet, New York 10954-5238
Telephone: (845) 371-2300
Counsel for Plaintiffs

## CERTIFICATION

Samuel Shechter, plaintiff herein, declares as to the claims under the federal securities laws that:

1. He has reviewed the attached Complaint against defendants and has authorized its filing.

2. He did not purchase the securities that are the subject of this action at the direction of his counsel, Depodwin & Murphy, Esqs. and Meiselman, Denlea, Packman, Carton & Eberz P.C., or in order to participate in this action.

3. He is willing to serve as a lead plaintiff and class representative on behalf of the class, including providing testimony at deposition and trial, if necessary. He fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act regarding his options as to selection and retention of counsel and overseeing the prosecution of the action for the class.

4. His securities transactions in Biometrics 2000 Corporation and/or Akcess Biometrics Corporation securities that are the subject of this action are set forth in the chart attached hereto as Schedule A.

5. He has never before sought to serve, and has never served, as a representative party for a class during the three years prior to the date of this certification, or ever.

6. He will not accept any payment for serving as a lead plaintiff on behalf of the class beyond his pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Nanuet, New York, this _15_ day of _December_, 2006.

SAMUEL SHECHTER

## Samuel Shechter - Schedule A

Samuel Shechter's securities transactions in Biometrics 2000 Corporation are as follows. This is based upon a review of numerous categories of records.

**PURCHASES:**

| Date | Number of Shares | Price Per Share |
|------|------------------|-----------------|
| 3/1/2004 | 6,500,000 | 0.11 |
| 7/1/2004 | 15,000,000 | 0.0525 |
| 9/8/2004 | 3,000,000 | 0.02 |
| 9/14/2004 | 2,000,000 | 0.015 |
| 10/13/2004 | 1,000,000 | 0.01 |
| 10/18/2004 | ######## | 0.009 |
| 1/28/2005 | 1,000,000 | 0.00775 |
| 3/11/2005 | 200,000 | 0.007 |

**SALES:**

| Date | Number of Shares | Price Per Share |
|------|------------------|-----------------|
| 8/31/2004 | (37,000) | 0.032 |
| 8/31/2004 | (56,000) | 0.03018 |
| 9/2/2004 | (39,000) | 0.021 |
| 9/2/2004 | (67,000) | 0.025 |
| 9/2/2004 | (73,000) | 0.025 |
| 9/3/2004 | (33,000) | 0.026 |
| 9/7/2004 | (48,000) | 0.02231 |
| 9/7/2004 | (83,000) | 0.02 |
| 9/7/2004 | (71,000) | 0.021 |
| 9/10/2004 | (22,000) | 0.022 |
| 9/10/2004 | (23,000) | 0.023 |
| 9/13/2004 | (26,000) | 0.022 |

| | | |
|---|---|---|
| 9/13/2004 | (76,000) | 0.012 |
| 9/13/2004 | (68,000) | 0.012 |
| 9/13/2004 | (46,000) | 0.012 |
| 9/14/2004 | (77,000) | 0.012 |
| 9/14/2004 | (74,000) | 0.014 |
| 9/14/2004 | (81,000) | 0.013 |
| 9/14/2004 | (73,033) | 0.013 |
| 9/15/2004 | (66,000) | 0.012 |
| 9/15/2004 | (63,000) | 0.012 |
| 9/15/2004 | (63,000) | 0.012 |
| 9/17/2004 | (56,000) | 0.017 |
| 9/17/2004 | (62,000) | 0.0149 |
| 9/17/2004 | (66,000) | 0.014 |
| 9/17/2004 | (71,000) | 0.014 |
| 9/20/2004 | (63,000) | 0.018 |
| 9/20/2004 | (60,000) | 0.022 |
| 9/20/2004 | (70,000) | 0.021 |
| 9/20/2004 | (63,000) | 0.018 |
| 9/20/2004 | (67,000) | 0.018 |
| 9/21/2004 | (58,000) | 0.016 |
| 9/21/2004 | (87,000) | 0.017 |
| 9/21/2004 | (75,000) | 0.016 |
| 9/22/2004 | (62,000) | 0.015 |
| 9/23/2004 | (67,000) | 0.013 |
| 9/23/2004 | (71,000) | 0.013 |
| 9/23/2004 | (77,000) | 0.012 |
| 9/24/2004 | (130,000) | 0.01 |
| 9/24/2004 | (130,000) | 0.01 |
| 9/24/2004 | (93,000) | 0.01016 |
| 9/24/2004 | (93,000) | 0.012 |
| 9/24/2004 | (158,000) | 0.012 |
| 9/24/2004 | (138,000) | 0.012 |
| 9/27/2004 | (130,000) | 0.017 |
| 9/27/2004 | (320,000) | 0.0178 |
| 9/28/2004 | (87,000) | 0.012 |
| 9/29/2004 | (126,000) | 0.012 |
| 10/4/2004 | (167,000) | 0.01 |
| 10/5/2004 | (138,000) | 0.01 |
| 10/5/2004 | (143,000) | 0.01 |
| 10/7/2004 | (50,000) | 0.01 |
| 10/8/2004 | (170,000) | 0.01 |
| 10/11/2004 | (160,000) | 0.009 |
| 10/12/2004 | (181,000) | 0.009 |
| 10/13/2004 | (158,000) | 0.009 |
| 10/13/2004 | (163,000) | 0.009 |
| 10/14/2004 | (174,000) | 0.009 |

| | | |
|---|---|---|
| 10/14/2004 | (169,000) | 0.009 |
| 10/19/2004 | (200,000) | 0.009 |
| 10/20/2004 | (200,000) | 0.008 |
| 10/21/2004 | (160,000) | 0.008 |
| 10/26/2004 | (267,000) | 0.008 |
| 11/3/2004 | (200,000) | 0.009 |
| 11/4/2004 | (145,000) | 0.009 |
| 11/5/2004 | (149,000) | 0.009 |
| 11/10/2004 | (200,000) | 0.009 |
| 11/10/2004 | (136,000) | 0.01 |
| 11/12/2004 | (185,000) | 0.01 |
| 11/12/2004 | (333,000) | 0.0095 |
| 11/15/2004 | (250,000) | 0.014 |
| 11/22/2004 | (100,000) | 0.008 |
| 11/23/2004 | (500,000) | 0.009 |
| 11/24/2004 | (10,000) | 0.009 |
| 11/26/2004 | (300,000) | 0.012 |
| 11/29/2004 | (700,000) | 0.0095 |
| 11/29/2004 | (225,000) | 0.011 |
| 11/29/2004 | (100,000) | 0.01 |
| 12/3/2004 | (265,000) | 0.00973 |
| 12/6/2004 | (200,000) | 0.0082 |
| 12/7/2004 | (170,000) | 0.0092 |
| 12/9/2004 | (440,000) | 0.009 |
| 12/9/2004 | (400,000) | 0.009 |
| 12/16/2004 | (188,000) | 0.008 |
| 12/16/2004 | (192,000) | 0.008 |
| 12/21/2004 | (210,000) | 0.008 |
| 12/31/2004 | (217,000) | 0.008 |
| 1/10/2005 | (183,000) | 0.00926 |
| 2/22/2005 | (200,000) | 0.0077 |
| 2/24/2005 | (247,000) | 0.00701 |
| 3/7/2005 | (233,000) | 0.007 |
| 3/8/2005 | (220,000) | 0.007 |
| 3/14/2005 | (200,000) | 0.007 |

## CERTIFICATION

Sheldon Ocko, plaintiff herein, declares as to the claims under the federal securities laws that:

1. He has reviewed the attached Complaint against defendants and has authorized its filing.

2. He did not purchase the securities that are the subject of this action at the direction of his counsel, Depodwin & Murphy, Esqs. and Meiselman, Denlea, Packman, Carton & Eberz P.C., or in order to participate in this action.

3. He is willing to serve as a lead plaintiff and class representative on behalf of the class, including providing testimony at deposition and at trial if necessary. He fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act regarding his options as to selection and retention of counsel and overseeing the prosecution of the action for the class.

4. His securities transactions in Biometrics 2000 Corporation and/or Akcess Biometrics Corporation securities that are the subject of this action are set forth in the chart attached hereto as Schedule A.

5. He has never before sought to serve, and has never served as a representative party for a class during the three years prior to the date of this certification, or ever.

6. He will not accept any payment for serving as a lead plaintiff on behalf of the class beyond his pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Westtown, New York, this _14_ day of _December_, 2006.

_____

SHELDON OCKO

## Schedule A - Sheldon Ocko

Sheldon Ocko's securities transactions in Biometrics 2000 Corporation are as follows:

**PURCHASES**:

| Date | Number of Shares | Price Per Share |
|------|------------------|-----------------|
| 10/3/2003 | 10,000 | 0.1060 |
| ###### | 300,000 | 0.0666 |